UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

MICHAEL E. CRUM,         )
                                      )
      Plaintiff,        )
                                      )
v.                           )     No.:   2:22-cv-151-TAV-CRW
                                      )
TOWN OF GREENEVILLE,    )
                                      )
      Defendant.     )

## MEMORANDUM OPINION

Before the Court is defendant Town of Greeneville's (the "Town") motion for summary judgment [Doc. 29]. Plaintiff responded [Doc. 35], the Town replied [Doc. 36], and the motion is ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons that follow, the Town's motion [Doc. 29] is **GRANTED**, and this case will be **DISMISSED**.

## I.    Material Facts[1]

The Town employed plaintiff in its police department for 31 years, from 1990 until December 6, 2021 [Doc. 29-1, pp. 7–10]. At the time of his separation from the Town, plaintiff served as the Town's Assistant Chief of Police, a position he held since 2018 [*Id.* at 103; Doc. 34 ¶ 2]. As Assistant Chief, plaintiff reported to Chief of Police Tim Ward [Doc. 34-2, p. 2].

---

[1] The Court only recites facts that it deems material in ruling on the Town's motion for summary judgment. This is because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McLemore v. Gumucio*, 619 F. Supp. 3d 816, 823 (M.D. Tenn. 2021).

## A.    Plaintiff's Separation from the Town

On September 1, 2021, the Town's Human Resource Department ("HR"), through its director, Patsy Fuller, received a written "Discrimination and Harassment" complaint from a female officer employed by the Town against plaintiff [*Id.* at 11; Doc. 29-1, pp. 13, 55–56; Doc. 34-1, p. 9; Doc. 34-3, pp. 2, 9, 18].   The bases of the complaint were "Sex/Gender," "Parental Status," and "Hostile Working Environment" [Doc. 29-1, pp. 13, 55–56].   The complaint further cited the following actions that plaintiff allegedly took against the complainant: "abuse of power, denied jobs because female parent, hostile environment, bullying, intimidation" [*Id.*].   Such actions were alleged to have occurred on August 18, 2021, and "collectively over the years" [*Id.*].   Chief Ward was listed as a witness to the incident [*Id.*].

Thereafter, Ms. Fuller discussed with Todd Smith, the City Administrator, how to investigate the complaint [*Id.* at 67].   They believed the best method was to send an anonymous survey soliciting feedback from department employees to determine if the allegations in the complaint were system-wide or limited to the one female officer [Doc. 34-1, pp. 12–13; Doc. 34-3, pp. 6, 15].   Accordingly, HR created and distributed the "Department Morale Survey" to employees in September 2021 [Doc. 29-1, pp. 28–30; 68–69; Doc. 34-1, p. 13; Doc. 34-2, p. 13].   Although the survey itself was anonymous, respondents were encouraged to speak with Ms. Fuller about their responses [*Id.*].   The survey solicited written comments and asked respondents to rate department morale on a scale of 1 to 10, with the lowest morale being 1 and the highest being 10 [Doc. 29-1, p. 29].

A similar survey was sent to plaintiff and Chief Ward, but plaintiff did not respond [*Id.* at 12, 68–69].

Of the 56 responses received, the average morale rating was 4.27 out of 10 [*Id.* at 31]. According to Ms. Fuller, only 8 or 9 out of 50 responses indicated that department morale was not bad [Doc. 34-3, p. 37]. In the written comments, respondents accused plaintiff of favoritism, "[b]elitt[ing] in front of crowds" and making fun of officers, among other allegations [Doc. 29-1, pp. 32–49].

After receiving the survey results, Ms. Fuller conducted in-person interviews with respondents [Doc. 34-3, p. 12]. Based on the feedback, Mr. Smith became concerned that the issues cited in the complaint were systemic and not isolated to the complaint against plaintiff [Doc. 29-1, pp. 75–77].

As a result, Mr. Smith onboarded a separate, objective third party, the Municipal Technical Advisory Services ("MTAS"), to conduct a review of the police department's culture [*Id.* at 58; Doc. 34-2, p. 14]. MTAS interviewed approximately 55 employees in the department and reviewed the results and data from the anonymous survey [Doc. 29-1, pp. 58–62]. MTAS did not investigate the specific allegations in the complaint against plaintiff [Doc. 34-2, pp. 42–43].

In November 2021, MTAS provided the Town a five-page written report containing its findings and recommendations (the "Report") [Doc. 29-1, pp. 58–62]. The Report only included findings that were supported by more than one employee [*Id.*]. Of relevance, the Report confirmed that only six or seven employees were content with the way the department was being managed [*Id.*]. It observed that plaintiff "has been described as evil,

3

polarizing, bad temper, revengeful, derogatory, a 'politician,' controlling, manipulative, two-faced, and vindictive" [*Id.* at 59]. MTAS also noted there were several instances "emanating from [plaintiff's] office, of gender-based discriminatory practices," including comments like "[w]omen don't belong in a police department" [*Id.* at 58–59].

Based on the findings, the Report made the following recommendations to the Town, in pertinent part:

- Morale issues created by [plaintiff], and indirectly by the Chief (by supporting the actions of the [plaintiff]) must be addressed (our sense is that the wrong people may be in these two positions). Whatever decisions are made regarding these personnel should be made as quickly as possible, in order that the Department is able to soon move forward.

- The numerous factors contributing to favoritism must be addressed.

- All issues related to the discrimination of women must be stopped. This includes those which create a hostile work environment.

[*Id.* at 62]. MTAS observed that several issues identified in the Report, specifically the hostile work environment and gender-based discrimination allegations, had the "potential to create significant liability for the Town" [*Id.*].

Plaintiff attributed the writings in the Report to MTAS, but he clarified that the information therein originated from Town employees [*Id.* at 14, 17]. He acknowledged that neither Mr. Smith nor Ms. Fuller made any statements in the Report [*Id.* at 15–16]. Moreover, he testified that he has no reason to dispute that the statements in the Report were not accurately recorded, although he questions the veracity of the statements by the employees [*Id.*]. Plaintiff speculated that officers could have manipulated their responses in the anonymous survey [Doc. 34-1, p. 15]. In particular, he explained the same officer

4

could have taken the survey as many times as they wanted from different IP addresses [*Id.* at 16]. Yet, plaintiff acknowledged he had no evidence to support his contention and no way of knowing [*Id.* at 15]. Regardless, he highlighted several statements in the Report that he felt were stigmatizing, humiliating, harmful to his reputation, or embarrassing [*Id.* at 17, 102].

Mr. Smith met with plaintiff and Chief Ward on November 30, 2021, at which time plaintiff received the anonymous survey results and Report [*Id.* at 10, 14; Doc. 34-2, p. 35; Doc. 30-2]. After reviewing the Report, plaintiff and Mr. Ward offered to go "line-by-line" to show Mr. Smith what they perceived as inaccuracies and lies [Doc. 30-2, pp. 5, 8, 10, 12, 22, 31–32, 45; Doc. 34-2, p. 35]. Plaintiff and Mr. Ward then proceeded to highlight some of those inaccuracies for Mr. Smith [*Id.*]. Mr. Smith told plaintiff that 90% of respondents recommended firing him and noted his belief that plaintiff no longer had the department behind him [Doc. 30-2, pp. 8, 24–27, 44]. He also highlighted his concern that the matter would result in a legal battle [*Id.*]. Mr. Smith then asked Chief Ward and plaintiff what they thought he should do, and they repeatedly stated they wanted the opportunity to "fix it" [*Id.* at 24–27]. After some time, Mr. Smith declined Chief Ward's offer to go through everything in the Report [*Id.* at 44]. Mr. Smith then said he hoped that plaintiff would have offered to retire after reviewing the Report [*Id.* at 44–45]. Mr. Smith gave plaintiff a few days to discuss the matter with Chief Ward and stated that he wanted plaintiff to submit a retirement letter [*Id.* at 48–49].

On December 6, 2021, plaintiff presented Mr. Smith a letter containing a list of conditions for which he would consider resigning or retiring [Doc. 34-2, pp. 38–39]. Those

5

conditions included a message from the Town that plaintiff voluntarily retired in good standing, a severance package, and a statement from the Town that the Report contained flaws and inaccuracies [Doc. 34-11]. The letter asserted that Mr. Smith's ultimatum (i.e., that plaintiff retire or be terminated) amounted to constructive termination of plaintiff's employment [*Id.*; *see also* Doc. 34-2, p. 38]. The letter also stated the Town's decision to terminate his employment was "illegal and wrongful" and a "blatant violation of due process and attack on [his] character and integrity" [Doc. 34-11].

Mr. Smith deemed the terms set forth in the letter unacceptable and decided to terminate plaintiff's employment with the Town on December 6, 2021 [Doc. 34-1, p. 10; Doc. 34-2, pp. 38–39; Doc. 34-12; Doc. 30-2, p. 50]. The Town provided plaintiff a "Separation Notice," which explained the circumstances of his separation as follows: "A complaint of a Hostile Work Environment and Discrimination was filed against [plaintiff]. A final review by the [MTAS] found the complaint had merit and concluded a hostile work environment and discrimination existed due to [plaintiff's] actions as an Assistant Police Chief" [Doc. 34-12; Doc. 29-1, p. 95; Doc. 29-2, p. 4; Doc. 34-2, p. 42].

Plaintiff testified that he requested an opportunity to clear his name from the statements in the Report [Doc. 29-1, pp. 22, 64; *see also* Doc. 34-1, pp. 21–23]. He claims he requested an in-person name-clearing hearing in an email he sent to Chief Ward on December 10, 2021 [Doc. 29-1, pp. 22–23; *see also* Doc. 35, p. 7]. That email, which bore the subject line "Grievance Notification," stated the following:

> Pursuant to 9.10 (Grievance Procedures) found in the TOG Employee Handbook, please accept this email as my written presentation of my grievance. I was not provided due process

and my termination of employment from the Town of Greeneville on December 6, 2021, was wrongful and I request a prompt investigation of the circumstances surrounding this grievance and that I be reinstated as the Assistant Chief of Police.

[Doc. 29-1, pp. 22–25, 64]. While Chief Ward was not supportive of plaintiff's separation from the Town, he states in a sworn declaration that plaintiff never made any requests to him for a name-clearing hearing, i.e., "(an expressed desire for a hearing to publicly clear the requestor's name following his termination of employment), either verbally or in writing" [Doc. 29-3, pp. 2–3].

In response to plaintiff's email, Mr. Smith informed plaintiff that he met with human resources and the Town's attorney to review Section 9.10 of the Town's Human Resource and Employee Handbook, Revision November 2019 (the "Handbook") and concluded that the provision did not apply to the circumstances of plaintiff's termination [Doc. 29-1, pp. 24–25, 63–64]. According to Mr. Smith, the grievance process did not apply to disciplinary actions [*Id.*; *see also* 29-2, pp. 92–93]. He further cited to Section 9.9 concerning employee dismissals, which provided that "the decision of the City Administrator shall be final and binding unless overturned or remanded by the chancery court on appeal" [Doc. 29-1, pp. 24–25, 63–64; Doc. 29-2, p. 92]. As a result, Mr. Smith stated that plaintiff would not have a grievance [*Id.*].

### B.    The Acknowledgement of Receipt and the Handbook

On January 27, 2020, plaintiff signed an "Acknowledgement of Receipt" to the Handbook [Doc. 29-1, p. 93; Doc. 34-2, p. 21; Doc. 34 ¶ 6]. Employees of the Town sign

the Acknowledgement upon receipt of the Handbook, which applied to plaintiff [Doc. 34-2, pp. 9, 21; Doc. 34-3, p. 17].

The Acknowledgment provides,

> I understand that the [Handbook] Regulations do NOT constitute a contract of employment; rather it is merely a statement of policies and procedures. I understand that the contents of the Human Resources Regulations do not confer any rights on or promises to me or guarantee my employment for any period of time other than defined in the Town Charter and/or the Town Civil Service Rules and Regulations. . . .
>
> I understand that nothing in the Human Resources Regulations or any summary brochure or employee handbook should be deemed to be a promise by the Town to provide any benefit. Rather, the Town reserves the right to alter or eliminate any benefit, without notice, at any time.

[Doc. 29-2, p. 94]. The Acknowledgement also reserved the right to the Town to "alter, eliminate, or otherwise change this policy, or any information, or benefit described in the [Handbook] by action of the governing body" [*Id.*]. The Handbook similarly reserved the right for the Town the right to change, alter, or remove any of the Handbook's provisions without notice to employees [*See, e.g.*, *id.* at 11, 15].

The introduction to the Handbook provided that its "policies and procedures are not part of a contract and no employee has any contractual right to the matters set forth herein" [*Id.* at 11]. Section 1.6 of the Handbook stated, "Nothing in the Human Resources rules and regulations document shall be deemed to give employees any more property rights in their jobs than may already be given by the Town charter and/or the Civil Service Rules and Regulations, as applicable" [*Id.* at 15].

8

The Handbook's dismissal provision provided that the City Administrator "may dismiss an employee for the good of the Town service" [*Id.* at 90]. It included a list of 16 "[r]easons for dismissal," which "may include, **BUT ARE NOT LIMITED TO:**" misconduct, negligence, and malfeasance, among other reasons [*Id.* at 90–91 (emphasis and capitalization in original)]. That provision further stated that an employee "shall be furnished an advance written notice containing the nature of the proposed action, the reasons therefore, and their rights to a pre-action meeting (hearing)" [*Id.* at 91]. Moreover, an employee facing dismissal "will be notified of the nature of a proposed action, the reasons therefore, and the employee's rights to a pre-action meeting to discuss" [*Id.*].

Another Handbook provision provided that "[a]ll employees are 'at will' and the Town is an 'at will' employer under Tennessee law. This means that an employee or the town may separate employment "at-will" for any reason, so long as the reason is not for an unlawful reason" [*Id.* at 30]. Notwithstanding this provision and the dismissal provision, Mr. Smith testified that there was "good cause" in terminating plaintiff's employment with the Town [Doc. 34-2, pp. 32–34]. When asked by plaintiff's counsel if "that's what it would take to dismiss him, wouldn't it," Mr. Smith responded, "It would. Yes, Sir, it would take cause" [*Id.* at 34]. Mr. Smith later testified that his prior testimony was not accurate [Doc. 37, pp. 40–41].

The three-step grievance procedure was set forth in Section 9.10 of the Handbook [Doc. 29-2, pp. 92–93]. It defined a grievance as "an employee's feeling of dissatisfaction, or any difference, disagreement, or dispute arising between an employee and his/her supervisor and/or other employees regarding some aspect of employment, application or

9

interpretation of regulations and policies, or some operational management decision affecting the employee" [*Id.* at 92]. The provision also provided that complaints "relate[d] to human resources actions arising out of disciplinary action" are not considered grievances [*Id.*]. If the complaint was not resolved in the first step of the grievance process, step two provided the employee the opportunity to request a hearing [*Id.* at 93].

The Handbook also included a provision about workplace harassment, which included certain procedures that "shall occur" when an allegation of harassment is made by an employee [*Id.* at 67–68]. For example, the investigator "will meet with the employees, any witnesses, the supervisor(s)," "will prepare a report of the complaint . . . and submit it to the City Administrator," "will make and keep a written record of the investigation," and "prepare and present findings to the City Administrator in a report," which was to include a written statement of the complainant, witnesses, and the person against whom the complaint of harassment was made [*Id.* at 67].

Plaintiff argues that none of these investigatory procedures were followed by the Town in investigating the complaint against him [Doc. 35, p. 8], which, for the most part, appears undisputed. Indeed, both Mr. Smith and Ms. Fuller seem to acknowledge in their depositions that the procedures set forth in the Handbook's workplace harassment provision were not strictly followed [Doc. 34-1, p. 23; Doc. 34-3, p. 25; *but see* Doc. 34-2, p. 15].[2] However, Mr. Smith testified that the November 30, 2021, meeting was a

---

[2] The Town seems to concede this point. Its position is that plaintiff was afforded adequate pre-deprivation procedures to which he was constitutionally entitled, assuming *arguendo* plaintiff possessed a property interest in continued employment in the first place [*see* Doc. 30, pp. 18–20].

10

pre-action meeting to get plaintiff's side of the Report [Doc. 34-2, p. 35]. Plaintiff argues, however, that he was denied the right to a pre-action meeting [Doc. 35, p. 9]. Plaintiff also takes issue with the fact that the Town did not investigate the complaint against him by the female officer [*Id.* at 23–28]. Indeed, the parties stipulate that plaintiff did not receive a copy of the complaint until the instant lawsuit was initiated [*see* Doc. 30, p. 18].

Mr. Smith could not recall interviewing plaintiff about the circumstances alleged in the complaint, but he testified that it would be typical and normal that plaintiff would be interviewed in an investigation [Doc. 34-2, pp. 19–20, 25]. Plaintiff's counsel then asked Mr. Smith, "That wouldn't be due process without doing that, would it?" to which Mr. Smith responded, "Correct" [*Id.*]. The Town's counsel then objected, as the question called for a legal conclusion [*Id.*].

Ms. Fuller initially testified that the Town did not have a policy for how to conduct investigations [Doc. 34-3, pp. 15–16]. But when asked why the Town did not follow the policies set forth in the Handbook, she testified there was no particular reason [*Id.* at 25]. Despite the Handbook specifying that that the investigator shall meet with witnesses, Ms. Fuller testified that she never met with Chief Ward, who witnessed the incident alleged in the complaint against plaintiff [*Id.* at 19]. However, Mr. Smith recalled meeting with Chief Ward [Doc. 34-2, pp. 18, 28]. Ms. Fuller also testified that she never met with plaintiff, but that Mr. Smith did [Doc. 34-3, pp. 20, 22].

When asked if she agreed whether the Handbook created an expectation among employees that the policies therein would be followed, she replied, "Yes" [*Id.* at 30]. Then,

when asked whether she believed "[e]mployees are due that right," she responded, "Yes" [*Id.*].

## C.     The Report Goes Public

According to Ms. Fuller, who is a custodian for the Town regarding public records act requests as they relate to matters involving human resources, the Town received seven public records requests regarding plaintiff's termination [Doc. 29-2, pp. 2, 95–104; Doc. 34, p. 4; Doc. 29-1, p. 20].  Five requests were from media outlets, one was from plaintiff's counsel, and one was from the FBI National Academy [*Id.*].

The Town provided the Report to all five media outlets and plaintiff's counsel [Doc. 29-2, p. 3].  Four of the five media outlets specifically requested the Report [*Id.* at 95–97, 99].  One media outlet did not specifically request the Report but asked for "information surrounding termination of" plaintiff and "details of his termination," including records comprising the "reason for termination" [*Id.* at 3].  Because the Report was referenced in plaintiff's Separation Notice, Ms. Fuller believed the public records request was sufficient to encompass the Report [*Id.*].  Likewise, she believed the request from plaintiff's counsel was sufficient to encompass the Report and warranted its disclosure, as he requested "all investigation documents and materials from 2021" [*Id.*].  In sum, Ms. Fuller testified that the Town provided a copy of the Report to six of the seven requestors, "as it is obligated to do under state law" [*Id.*].  Plaintiff does not appear to dispute any of the above [*see, e.g.* Doc. 34, p. 4].

As a result, local newspapers and local television stations reported on the circumstances of plaintiff's termination [Doc. 34-2, p. 43; *see also, e.g.*, Doc. 34-14;

12

Doc. 34-13]. The Report also was made public in the online news articles [Doc. 34-2, p. 44; Doc. 34-14].

In response to an interrogatory asking for specifics about the "harmful reports" made against him by the Town, plaintiff cited only the Report [Doc. 29-1, pp. 101–02]. But in response to the Town's statement of undisputed material facts, plaintiff also seems to point to comments made by Mr. Smith in his deposition indicating he issued a statement to local media about plaintiff's termination [Doc. 34, p. 3 (citing Doc. 34-2, pp. 45–47); *see* Doc. 34-13, p. 7]. Mr. Smith's statement reads as follows:

> In September of this year, The Town of Greeneville received a written complaint from an employee of discrimination and harassment within the Greeneville Police Department. The City Administrator and Human Resources initiated an internal review to include a department wide voluntary survey as a result of the complaint. After reviewing the survey results, the City Administrator requested the University of Tennessee [MTAS] to conduct an external review of the department [sic]. The Town is committed to serving the citizens of Greeneville and is taking the results of the MTAS review to make improvements to the Police department. Greeneville is addressing every opportunity to improve the services the Greeneville Police Department provides to citizens every day.

[Doc. 34-2, p. 46; Doc. 34-13, p. 7].

### D.    Plaintiff's Subsequent Employment

Although plaintiff did not apply for any employment following his termination in December 2021, he testified that he could have [Doc. 29-1, pp. 2, 6, 100]. He did not seek employment with any police department, sheriff's office, law enforcement agency, or municipality, county, or state agency because he believed there was no reason to apply given what was "going on in the newspaper" [*Id.* at 5–6]. Although plaintiff has not applied

13

for any employment, he has worked as security for two employers after they sought him out to work for them [*Id.* at 6, 100; Doc. 36-1, p. 8].

Within the first week after his termination, plaintiff recalled that the colonel of the Tennessee Highway Patrol, a friend of his, texted him and asked if he would be interested in serving there as the director of the gun unit [Doc. 34-1, pp. 2–5]. After plaintiff expressed his interest to the colonel about the position, he never heard anything further [*Id.*]. Plaintiff never followed up with or asked the colonel about the role, but he assumed he did not hear back about the position because the Report was made public [*Id.*].

### E.    The Instant Lawsuit

Plaintiff brings Fourteenth Amendment due process claims against the Town pursuant to 42 U.S.C. § 1983 based on alleged violations of his property and liberty interests related to the termination of his employment [Doc. 25 ¶ 32]. He also brings a breach of contract claim under Tennessee law against the Town, alleging that the Town's HR regulations amounted to a contract, which the Town breached "multiple" times [*Id.* ¶ 33].

## II.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the initial burden of informing the court of the basis for its

motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party can satisfy this burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). As indicated *supra*, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## III.    Analysis

Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978) plaintiff may bring a Section 1983 claim against a municipality like the Town. "[F]or a municipal entity to be liable [under Section 1983], a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015) (internal citation omitted). A plaintiff "cannot prevail on a claim against the municipality" without showing a "constitutional injury." *Cass v. City of Dayton*, 770 F.3d 368, 377 (6th Cir. 2014). A municipality is not liable under Section 1983 "unless there is an underlying

15

unconstitutional act." *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021) (quoting *Andrews v. Wayne Cnty.*, 957 F.3d 714, 725 (6th Cir. 2020)).

To establish a procedural due process claim under the Fourteenth Amendment, a plaintiff must demonstrate that: (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) he was not afforded adequate procedural protections. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014). Plaintiff claims he possessed a property interest in his continued employment with the Town and a liberty interest stemming from his termination, and that the Town deprived him of both interests, thereby violating his constitutional rights [Doc. 23 ¶ 32].

## A.    Property Interest[3]

To prevail on his due process claim, plaintiff first must establish that he had a protected property interest in his employment. *See Freeze v. City of Decherd*, 753 F.3d 661, 665 (6th Cir. 2014). Plaintiff argues that the Handbook created enforceable contractual terms, thereby giving rise to a property interest in his continued employment, and that the Town breached those terms and deprived him of his property interest [Doc. 35, pp. 9–13, 14–16]. He further claims that Mr. Smith and Ms. Fuller's deposition

---

[3] To avoid repetition, the Court evaluates plaintiff's state law breach of contract claim together with his claim that he had a property interest in his employment, as the legal principles are the same. *See McManamon v. Charter Twp. of Redford*, No. 99-2144, 2000 WL 1888616, at *6 (6th Cir. 2000) (affirming the district court's grant of summary judgment on the plaintiff's procedural due process and breach of contract claims and observing that both claims "rise and fall together").

16

testimony prove that he was entitled to "good cause" termination and due process [*Id.* at 12, 14–17].

The Town argues that the Handbook does not evince its intent to be bound by the Handbook's provisions and therefore does not create an employment contract which would establish a protected property interest in plaintiff's employment [Doc. 30, p. 12].

An individual claiming to have a protected property interest in his employment "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "Whether a person has a 'property' interest is traditionally a question of state law." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)). "[A] state statute, a formal contract, or a contract implied from the circumstances" can give rise to a property interest. *Ludwig v. Bd. of Trs.*, 123 F.3d 404, 409 (6th Cir. 1997) (citations omitted); *see also Perry v. Sinderman*, 408 U.S. 593, 602 (1972) (observing that property interests can be created by explicit contractual terms or implied agreements from a "promisor's words and conduct in light of the surrounding circumstances") (internal quotation marks omitted) (citation omitted).

"Tennessee has long recognized the doctrine of employment at will, with the mutual right of either party to terminate such a relationship with or without cause." *Brown v. City of Niota*, 214 F.3d 718, 721 (6th Cir. 2000). Indeed, the Sixth Circuit has observed that "[t]he law in Tennessee operates under a broad presumption that employees are at will and, by default, lack a property right in their continued employment." *Freeze*, 753 F.3d at 665.

17

"Tennessee courts read this presumption to mean that employees cannot claim an interest in continued employment unless they first prove that a contract governed the terms of employment." *Id.*

Moreover, "Tennessee courts have 'recognized that an employee handbook can become a part of an employment contract.'" *Brown*, 214 F.3d at 721 (quoting *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997)). "In order to constitute a contract, however, the handbook 'must contain specific language showing the employer's intent to be bound by the handbook's provisions.'" *Id.* (quoting *Rose*, 953 S.W.2d at 692). Specifically, "the language used must be phrased in binding terms, interpreted in the context of the entire handbook, and read in conjunction with any other relevant material[.]'" *Rose*, 953 S.W.2d at 692 (quoting *Claiborne v. Frito-Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989)). But there is "a high standard for establishing the existence of an employer's specific intent to be bound by the terms of an employee handbook." *Brown*, 214 F.3d at 721.

"Even where part of the manual may be considered to give rise to a definitive guarantee based on past practices of the company, a manual will not necessarily be treated as a contract if specific language within the manual disclaims certain guarantees." *MacDougal v. Sears, Roebuck & Co.*, 624 F. Supp. 756, 759 (E.D. Tenn. 1985). That is, "'[w]here an employee handbook specifically provides that it is not a contract and reserves to the employer the unilateral right to amend the handbook's provisions, such handbook does not, as a matter of law, constitute part of the employment contract between the employer and the employee.'" *Wiggins v. Kimberly-Clark Corp.*, No. 3:12-CV-115, 2012

18

WL 4863158, at *4 (E.D. Tenn. Oct. 12, 2012) (quoting *Adcox v. SCT Prods.*, No. 01A01-9703-CV-00123, 1997 WL 638275, at *3 (Tenn. Ct. App. Oct. 17, 1997)).

Here, plaintiff has not satisfied the "high standard" in demonstrating that the Town intended to be bound by the terms of the Handbook. *See Brown*, 214 F.3d at 721.

First, both the Acknowledgement of Receipt, which plaintiff signed, and the Handbook expressly provide that the provisions in the Handbook do not constitute a contract of employment [Doc. 29-2, pp. 11, 94]. Moreover, both the documents reserve the right to the Town to change, alter, eliminate or remove any of the Handbook's provisions without notice to employees [*See, e.g.*, *id.* at 11, 15]. Such disclaimers are sufficient to prevent the Handbook's provisions, "and any procedural protections they afford, from being construed as creating a property interest in continued employment or a binding employment contract." *See Keller v. City of Cleveland*, No. 1:13-CV-91, 2014 WL 2809662, at *6 (E.D. Tenn. June 20, 2014) (citing *McCarthy v. UT-Battle, LLC*, No. E2003-02052-COA-R3-CV, 2004 WL 350665, at *1 (Tenn. Ct. App. Feb. 25, 2004)); *see also MacDougal*, 624 F. Supp. at 759; *Wiggins*, 2012 WL 4863158, at *4.

As the Town notes [Doc. 30, p. 15], courts also look to the use of permissive and mandatory terms in determining whether a handbook or employee manual creates a basis for "for cause" termination. Here, the Handbook's dismissal provision includes permissive language, specifically providing that "[t]he City Administrator *may* dismiss an employee for the good of the Town service," which, contrary to plaintiff's position, does not necessarily mean "good cause" termination [Doc. 29-2, p. 90 (emphasis added); *see also* Doc. 35, pp. 3, 7, 13]. This language is identical to the language in the city charter in

19

*Keller*, which gave the City Manager power to terminate employees "when deemed necessary for the good of the service." *See Keller*, 2014 WL 2809662, at *5. There, the court found "the power to dismiss employees is not cabined to cause," despite the inclusion of the word "good." *Id.* Because "the good of the service" "could encompass any number of reasons for terminating an employee," the court concluded that the charter did not create a property interest in continued employment with the city. *Id.*

In addition to permissive language, the dismissal provision here contains a list of 16 nonexclusive reasons for dismissal [Doc. 29-2, pp. 90–91 (stating that the reasons for dismissal "may include, **BUT ARE NOT LIMITED TO**") (emphasis and capitalization in original); *see also* Doc. 34-2, p. 33]. This list may be fairly "characterized as examples of grounds for discharge leading to the inference that they are not the exclusive bases for terminating city employees." *See Brown*, 214 F.3d at 721–22 (concluding a property right did not exist where the dismissal provision contained permissive language and identified certain nonexclusive acts as grounds for discharge) (citing *Ogburn v. Gas & Water Dep't*, No. 01A01-9702-CH-00056, 1997 WL 528812, at *4–5 (Tenn. Ct. App. Aug. 27, 1997)). Accordingly, the Court concludes that the dismissal provision, which included permissive language and a nonexclusive list of reasons for dismissal, does not evidence a clear intent to create a property interest in continued employment with the Town. *See id.* *See also Keller*, 2014 WL 2809662, at *5.

Viewing the dismissal provision "in the context of the entire" Handbook underscores this conclusion. *See Rose*, 953 S.W.2d at 692 (citation omitted). Indeed, a

20

separate Handbook provision expressly provides that all employees are "at will" and that the Town may separate employment "at-will" for any reason that is not unlawful [*Id.* at 30].

In support of his claim that the Handbook created a property interest and employment contract, plaintiff focuses exclusively on provisions in the Handbook with mandatory language—specifically the provision on investigating harassment [Doc. 35, pp. 10–14]. He then maintains that the Town failed to follow its policy and procedures in investigating the harassment complaint and terminating his employment [*Id.* at 12–13, 15–16].

Plaintiff's argument is not well taken. The Sixth Circuit has held that the inclusion of some mandatory language in a handbook describing a pretermination hearing process is not dispositive where the "context of the entire handbook" makes clear that the handbook is not to be construed as a contract. *See Medlin v. City of Allgood*, 814 F. App'x 7, 16 (6th Cir. 2020). *Medlin* is instructive here. There, the handbook similarly contained mandatory language describing a pretermination hearing process. *Id.* Nevertheless, the Sixth Circuit concluded that the "context of the entire handbook" demonstrated that the City did not intend to be bound by the handbook's provisions. *Id.* That is because, much like the Handbook here, the handbook in *Medlin* expressly stated it was not an employment contract and reserved the right to the City "to change any or all such policies, practices, and procedures in whole or in part at any time, with or without notice to employees." *Id.* The Sixth Circuit thus concluded that the plaintiff did not have a protected property interest in her employment. *Id.* Accordingly, that the Handbook contains some mandatory language is insufficient to create a property interest where the Handbook explicitly

21

provides that it is not to be construed as a contract and reserves the right to the Town to amend it whenever. *See id.*

Plaintiff also argues he had a reasonable expectation that he was entitled to due process (i.e., that the Town would follow the procedures in the Handbook) and could be terminated only for good cause based on the deposition testimony of Mr. Smith and Ms. Fuller [*Id.*]. Specifically, he represents that Mr. Smith "acknowledged [plaintiff's] property interest in his continued employment" [*Id.* at 12, 16–17], and Ms. Fuller admitted that plaintiff was denied his due process rights and procedures [*Id.*]. According to plaintiff, Mr. Smith and Ms. Fuller testified that Town employees should have a due process right and expect that the Town would follow its own policies [*Id.* at 3, 12, 14–18].

In reply, the Town argues that plaintiff misrepresents and mischaracterizes their testimony [Doc. 36, p. 3]. The Town further submits that it is a question of law for the Court, not the witnesses, to determine the existence or nonexistence of a contract or constitutional right afforded to plaintiff [*See, e.g.*, *id.* at 2–3, 9 n.4]. The Court will review each of their testimony in turn.

Mr. Smith initially testified he had good cause to terminate plaintiff's employment with the Town [Doc. 34-2, pp. 32–34].[4] When plaintiff's counsel asked Mr. Smith if "that's what it would take to dismiss him, wouldn't it," Mr. Smith responded, "It would. Yes, Sir,

---

[4] Without support, plaintiff submits that it is "uncontested" that the Town did not have good cause to terminate his employment [Doc. 35, pp. 9, 14, 16]. The record does not substantiate this assertion. Specifically, Mr. Smith testified that he had good cause in terminating plaintiff's employment [Doc. 34-2, pp. 32–34].

22

it would take cause" [*Id.* at 34]. Mr. Smith later clarified that his prior testimony was not accurate [Doc. 37, pp. 40–41 ("Q: Is it your testimony that it would take [cause] to terminate Crum. Is that accurate? A: No.")]. With this context, the Court does not consider Mr. Smith's testimony as creating a genuine dispute of fact, particularly in light of the legal principles described above and the express provisions of the Handbook that provided otherwise.

Counsel for the Town then objected to a question posed to Mr. Smith about whether the Town's failure to get plaintiff's side of the story "wouldn't be due process [sic], would it?" to which Mr. Smith responded, "Correct" [Doc. 34-2, p. 20]. The basis of the Town's objection was that Mr. Smith, a non-lawyer, was asked to answer a hypothetical legal question—specifically whether a certain action or inaction violated the due process clause [*Id.*; *see also* Doc. 36, pp. 2, 12]. The Town further observes that the question is a legal one for the Court, and not Mr. Smith [Doc. 36, p. 2].

The Court agrees with the objection and finds that the statement does not carry the legal significance that plaintiff promotes. *See, e.g.*, *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (explaining that courts, at the summary judgment stage, "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge . . . or purport[ ] to state legal conclusions as fact"). Indeed, testimony that amounts to a legal conclusion is improper. *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, No. 4:17CV303, 2019 WL 9899920, at *10 (E.D. Tex. June 28, 2019) (citing Fed. R. Evid. 704(a)). "'There is one, but only one, legal answer for every cognizable dispute. There being only one applicable legal rule

for each dispute or issue, it requires only one spokesman of the law, who of course is the judge.'" *Id.* (citations omitted). As a result, the Court does not consider this testimony as raising a genuine dispute of fact on the issue.

Plaintiff also points to Ms. Fuller's testimony in which she agreed with plaintiff's counsel that in disseminating "a handbook to employees that they have an expectation that you're going to follow those policies" [Doc. 34-3, p. 30]. She further agreed with plaintiff's counsel's question whether "[e]mployees are due that right," meaning that the Town would follow the polices in the Handbook [*Id.*]. Based on this testimony, plaintiff represents that Ms. Fuller "confirmed [plaintiff] was entitled to the due process procedures for investigating complaints" [Doc. 35, p. 17]. The Town, in reply, observes that her testimony does not contain the terms due process or due process right, and her testimony is immaterial absent a foundation that she is a qualified legal expert [Doc. 36, pp. 3, 13].

Much like Mr. Smith's testimony, to the extent plaintiff purports to use Ms. Fuller's testimony "to state legal conclusions as facts," *see Murphy*, 372 F.3d at 982, i.e., that plaintiff had a due process right, Ms. Fuller's testimony does not carry the legal significance that plaintiff promotes, and the Court will not consider her testimony in that regard.

The primary problem with the above testimony from Mr. Smith and Ms. Fuller is that plaintiff fails to explain how it is material and gives rise to a genuine dispute of fact as to whether a contract or property right existed under prevailing case law and in light of the express language in both the Acknowledgement of Receipt and the Handbook. Plaintiff seemingly ignores that both the Acknowledgement and Handbook expressly provide that

24

the Handbook is not to be considered a contract and reserves to the Town the right to amend the Handbook whenever it wishes. He also does not acknowledge that "[e]ven where part of the manual may be considered to give rise to a definitive guarantee based on past practices of the company, a manual will not necessarily be treated as a contract if specific language within the manual disclaims certain guarantees." *See MacDougal*, 624 F. Supp. at 759. The above supports the Court's conclusion that their testimony, if considered as plaintiff submits, does not give rise to a factual dispute on this matter in the face of the clear disclaimers in the Acknowledgement and the Handbook.

For the reasons above, the Court concludes that the Handbook did not create a property interest in plaintiff's continued employment or constitute an employment contract under Tennessee law. The Town's motion will be granted as to plaintiff's breach of contract and § 1983 claims.

### B. Liberty Interest

Plaintiff next claims he had a protected liberty interest of which the Town deprived him after terminating his employment [Doc. 25 ¶¶ 4, 32].

A liberty interest in employment typically stems from some kind of defamation connected with an employee's termination. *Roth*, 408 U.S. at 573. "That liberty interest is impugned when a state actor 'stigmatize[s]' an individual by means of 'voluntary, public dissemination of false information' about the individual." *Crosby v. Univ. of Ky.*, 863 F.3d 545, 555 (6th Cir. 2017) (quoting *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002)). Defamation alone, however, is not enough to invoke due process concerns. *Id.*; *see also Paul v. Davis*, 424 U.S. 693, 706 (1976) (observing that "the [Supreme Court] has never

25

held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment"). "[R]ather, the alleged damage must be tied to '[s]ome alteration of a right or status 'previously recognized by state law.'" *Crosby*, 863 F.3d at 555 (quoting *Quinn*, 293 F.3d at 319).

The Sixth Circuit has identified the following five factors to consider when determining whether a plaintiff was deprived of a liberty interest:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Brown*, 214 F.3d at 722–23 (internal citations omitted) (citing *Ludwig*, 123 F.3d at 410). "Once a plaintiff has established the existence of all five elements, he is entitled to a name-clearing hearing *if he requests one*." *Id.* (emphasis added). "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn*, 293 F.3d at 320.

The Town argues that plaintiff has failed to establish the existence of all five factors, and even if he could, he has not proven that he requested a name-clearing hearing [Doc. 30, pp. 22–30]. Meanwhile, plaintiff believes he has established the five factors and requested a name-clearing hearing [Doc. 35, pp. 18–20].

26

The Court finds that plaintiff's claimed deprivation of a protected liberty interest fails for the following reasons.

First, plaintiff has not demonstrated that any "stigmatizing" action by the Town damaged his reputation so significantly to foreclose comparable employment opportunities in law enforcement. *See Edelstein v. Gmoser*, No. 21-3292, 2022 WL 4372200, at *3 (6th Cir. Aug. 29, 2022).[5] A plaintiff claiming a deprivation of a protected liberty interest "'must demonstrate stigmatizing governmental action which so negatively affects [her] . . . reputation that it effectively forecloses the opportunity to practice a chosen profession.'" *Id.* (quoting *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017)). "'A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation.'" *Id.* (citation omitted) (quoting *Joelson v. United States*, 86 F.3d 1413, 1420–21 (6th Cir. 1996)). As another court stated, "to infringe an employee's liberty interests, the circumstances of the termination must make it virtually impossible for the employee to find new employment in that field." *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1348–49 (7th Cir. 1995).

Here, plaintiff testified that he did not seek out any employment opportunities in law enforcement, at a public agency, or otherwise after his employment was terminated, though he acknowledged that he could have applied [Doc. 34-1, p. 2]. Nevertheless,

---

[5] To the extent plaintiff argues that the statement issued by Mr. Smith to local media triggered the right to a name-clearing hearing, plaintiff has not submitted any argument on the matter and appears to note only that Mr. Smith issued a statement [Doc. 34, p. 3; Doc. 35, pp. 7, 18–20]. As the Town observes, plaintiff does not attempt to argue, among the other factors, that the statement was false [Doc. 36, p. 8]. Because plaintiff has not met his burden, the Court does not consider Mr. Smith's statement as supportive of plaintiff's liberty interest claim.

plaintiff held two other jobs [Doc. 29-1, pp. 6, 100; Doc. 36-1, p. 8]. *See Kendall v. Bd. of Ed. of Memphis City Sch.*, 627 F.2d 1, 5 (6th Cir. 1980) (concluding that a plaintiff who never applied for another teaching job after her termination but held other jobs was not foreclosed from other employment opportunities); *see also Guster v. Hamilton Cnty. Dep't of Educ.*, No. 1:02-CV-145, 2004 WL 1854181, at *16 (E.D. Tenn. Mar. 2, 2004) (observing the plaintiff failed to prove he was stigmatized by an adverse employment decision where he made no effort to apply for comparable jobs and offered no proof that his employment application was rejected because of the adverse employment decision).

Plaintiff did offer testimony that he was approached by the colonel of the Tennessee Highway Patrol about a job opportunity and did not hear back about the position after the Report was published in the local media [Doc. 35, p. 10; Doc. 34-1, pp. 2–5]. Plaintiff did not follow up with the colonel to ask anything further about the position, and plaintiff testified that the colonel did not say anything to him about the Report [Doc. 34-1, pp. 3–6]. It was plaintiff's assumption that he did not hear back about the position because of the Report, and plaintiff seemed to acknowledge that he did not know why he never heard back [*Id.*].

As the Town highlights, plaintiff has not offered probative evidence, such as the sworn testimony of the colonel, to support his assumption and speculation that he did not hear back from the colonel because of the Report's stigmatizing comments [Doc. 36, p. 5]. A party cannot defeat summary judgment with inadmissible evidence, *see* Fed R. Civ. P. 56(c)(1)(B), including "conclusory allegations, speculation, and unsubstantiated assertions." *Jennings v. County of Monroe*, 630 F. App'x 547, 555 (6th Cir. 2015); 10A

Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 2727.2 (4th ed. 2021) (observing that "evidence in opposition to [a summary judgment] motion that clearly is without any force," such as evidence based on "mere suspicions," "is insufficient to raise a genuine issue").

Even considering his speculative testimony, plaintiff has failed to demonstrate that a "range of opportunities [was] no longer open" in law enforcement due to his separation from the Town. *See Edelstein*, 2022 WL 4372200, at *3 (citation and internal quotation marks omitted). This is because plaintiff did not make an effort to apply for any comparable employment, yet he managed to secure security work from two other employers. *See Carroll v. Knox Cnty. Bd. of Educ.*, No. 3:07-CV-345, 2010 WL 2507046, at *13 (E.D. Tenn. June 17, 2010) (quoting *Garvie v. Jackson*, 845 F.2d 647, 652 (6th Cir. 1988)); *Guster*, 2004 WL 1854181, at *16. *See also Edelstein*, 2022 WL 4372200, at *3 (observing that the defendant purported to apply to more than 270 jobs without success but "offered no evidence that her failure to be hired for any of these positions was caused by a damaged reputation").

Moreover, plaintiff has failed to demonstrate that public dissemination of the Report was voluntary. He claims the Town voluntarily tapped MTAS to investigate the allegations from the anonymous survey and voluntarily shared the survey results with MTAS [Doc. 35, p. 19]. He argues that the Town knew or should have known that the survey data, which was incorporated into the Report, would have been subject to an open records request [*Id.*]. Accordingly, plaintiff contends the Town "cannot hide behind its compliance

29

with open records requests from the media to avoid liability" [*Id.*].  Plaintiff does not cite any legal authority to support his theory on voluntariness.

The Town argues that it was required to disseminate the Report to comply with the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-501, *et seq.* (the "Act") [Doc. 30, p. 26].  Section 10-7-503 requires that "all documents . . . made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental entity" be made available for inspection and that "those in charge of the records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law."  Subsection (3) further provides that "[f]ailure to respond to the request . . . shall constitute a denial and the person making the request shall have the right to bring an action" in court.  § 10-7-503(3).  The Town's position is that Report was a "transaction of official business," i.e., "a report detailing the findings of a Town-initiated independent investigation" of its police department, and as a result, it was subject to the Act [Doc. 30, p. 26 n.6; *see* Doc. 35, p. 19].  Because the Town was legally obligated to comply with the Act upon receiving public records requests from five local media outlets, it argues that the dissemination of the Report was involuntary [Doc. 30, p. 27; Doc. 36, p. 6].  Plaintiff does not appear to take issue with any of the above.

It is undisputed that the Town received five public records requests from local media organizations, four of which specifically asked for the Report [Doc. 29-2, pp. 2, 95–104; Doc. 34, p. 4; Doc. 29-1, p. 20].  The one media outlet that did not specifically request the Report asked for "information surrounding termination of" plaintiff and "details of his termination," including records comprising the "reason for termination" [Doc. 29-2,

pp. 3, 98]. Because the Report was referenced in the Separation Notice, Ms. Fuller believed the request was sufficient to encompass the Report and warranted its disclosure [*Id.*]. For the same reasons, Ms. Fuller disclosed the Report to plaintiff's attorney [*Id.*]. In sum, Ms. Fuller testified that the Town provided a copy of the Report to all five media outlets, "as it is obligated to do under state law" [*Id.*]. Plaintiff does not dispute any of the above.

The Town's argument about voluntary disclosure is well taken. In support, the Town cites to two Sixth Circuit cases for the proposition that dissemination is involuntary and does not deprive an employee of a liberty interest where disclosure is required by state law [Doc. 30, p. 27]. For example, in *Kendall*, charges against the plaintiff were made public in criminal and civil state court proceedings involving the plaintiff's conduct and in a separate but related tenure hearing. *Kendall*, 627 F.2d at 4–5. Because the defendant was legally required to make its charges public in those proceedings, the Sixth Circuit concluded that disclosure was involuntary. *Id. See also Prichard v. Lafferty*, No. 91-5257, 1992 WL 205659, at *1, *6 (6th Cir. 1992) (citing *Kendall* and concluding disclosure was involuntary where the allegedly false statements were included in the Board's meeting minutes and disclosed pursuant to Kentucky state law governing termination procedures).

While *Kendall* and *Prichard* do not involve public records requests and concern state laws governing dismissal procedures of state employees, plaintiff provides no argument as to why the Sixth Circuit's reasoning would not extend to the circumstances of this case. There is no dispute that Tennessee law required the Town to turn over the

information requested, including the Report. Therefore, the Court concludes that, under *Kendall* and *Prichard*, the Town's disclosure of the Report was involuntary.

Finally, assuming *arguendo* plaintiff could establish the five factors, he has not proven that he requested a name-clearing hearing. The Sixth Circuit has held that a "plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Quinn*, 293 F.3d at 323 (citations omitted).

Plaintiff contends he requested a name-clearing hearing, though he recognizes that he "may not have asked for a specifically termed 'name-clearing' hearing" [Doc. 35, p. 20]. Instead, he argues that he requested in writing the rights set forth in the Town's grievance procedures, which included an oral or written presentation up to an oral hearing [*Id.*]. Specifically, plaintiff submits that he requested a name-clearing hearing in an email he sent Chief Ward on December 10, 2021, with the subject line "Grievance Notification" [Doc. 29-1, pp. 22–25, 64]. The email states:

> Pursuant to 9.10 (Grievance Procedures) found in the TOG Employee Handbook, please accept this email as my written presentation of my grievance. I was not provided due process and my termination of employment from the Town of Greeneville on December 6, 2021, was wrongful and I request a prompt investigation of the circumstances surrounding this grievance and that I be reinstated as the Assistant Chief of Police.

[*Id.*].

The Town argues that plaintiff's email did not sufficiently apprise it of his desire for a hearing to clear his name [Doc. 30, p. 29]. The Court agrees.

32

As the Town observes, the Sixth Circuit has held that a plaintiff's bare reference to "due process" may be insufficient to show that the plaintiff requested a name-clearing hearing [Doc. 30, p. 28]. *See, e.g.*, *id.* at 322–23; *Ludwig*, 123 F.3d at 411. This is particularly the case where the plaintiff claims (or may claim) a deprivation of both liberty and property interests. *See Quinn*, 293 F.3d at 322–23, *Ludwig*, 123 F.3d at 411. This is because, in such instances, a general request for "due process" or an assertion that a "due process" violation occurred, without more, is likely insufficient to put the defendant on notice of the particular deprivation claimed. *See Ludwig*, 123 F.3d at 411 (distinguishing *Rosenstein v. City of Dallas, Tex.*, 876 F.2d 392 (5th Cir. 1989), *opinion reinstated in part*, 901 F.2d 61 (5th Cir. 1990) (finding that plaintiff's request for an "appeal" from his termination for something he "did not do" constituted a request for a name-clearing hearing where the only issue in the case was the truth or falsity of the charge that stigmatized the plaintiff)).

Plaintiff's December 10, 2021, email, wherein he attempted to invoke the Town's grievance procedures and requested an investigation of his termination, does not constitute a request for a name-clearing hearing. Plaintiff brings both liberty and property deprivation claims in the instant lawsuit. Accordingly, this is not a case where the only issue is the truth or falsity of the stigmatizing statements made about plaintiff. *See Rosenstein*, 876 F.2d at 396. However, nothing in plaintiff's email to Chief Ward would have alerted the Town to the fact that he was claiming (or intending to claim) he was deprived of a liberty interest as opposed to (or in addition to) a property interest. *See Ludwig*, 123 F.3d at 411. Contrary to plaintiff's representation that he requested an in-person hearing [Doc. 35, p. 7],

33

he did not specifically ask for a name-clearing hearing in his email to Chief Ward, which would have put the Town on notice that he was contemplating a liberty deprivation claim [Doc. 29-1, pp. 22–25, 64; Doc. 29-3, pp. 23–24, 64]. *See id.* (ruling that the plaintiff was required to specifically request a name-clearing hearing where he raised both liberty and property deprivation claims). Moreover, plaintiff did not suggest in the email that he wanted the opportunity to clear his name from any stigmatizing comments made by the Town. In fact, his email does not even hint at any comments that he perceived as stigmatizing at the time, or insinuate that he believed his reputation was harmed by any comments made by the Town.

That plaintiff could have been afforded some kind of hearing during the course of the Town's grievance process if he later asked for one does not change the result [Doc. 29-2, pp. 92–93]. Even if the grievance procedures applied to plaintiff's termination, which the Town disputes, the procedures, including the possibility of a hearing, could have pertained to his property deprivation claim. Finally, the Court observes that Chief Ward, who was not supportive of plaintiff's termination, asserted that plaintiff never made any requests to him for a name-clearing hearing, i.e., "(an expressed desire for a hearing to publicly clear the requestor's name following his termination of employment), either verbally or in writing" [Doc. 29-3, pp. 2–3]. Accordingly, the Court agrees with the Town that plaintiff's email did not constitute a request for a name-clearing hearing.

For the reasons above, plaintiff's claim that he was deprived of a liberty interest will be dismissed.

## IV.     Conclusion

For the reasons explained above, the Town's motion for summary judgment [Doc. 29] will be **GRANTED**, and this case will be **DISMISSED**.  A separate order will enter.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE